IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

*Newport News Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 4:24-cr-49 |
| JAMAL A. SHIELDS, | |
| Defendant. | |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNT THREE

The defendant, Jamal A. Shields, is currently charged in Count Three of the Superseding Indictment (ECF No. 45) with Illegal Receipt of a Firearm by a Person Under Indictment, in violation of 18 U.S.C. § 922(n). In his Motion to Dismiss, the defendant asserts that this charge is unconstitutional on its face and as applied to him. ECF No. 53. Although recent developments in Second Amendment jurisprudence have changed the legal landscape, the decisions in *New York State Rifle & Pistol Association, Inc, et al. v. Bruen*, 142 S. Ct. 2111 (2022) and *United States v. Rahimi*, 144 S. Ct. 1889 (2024), do not upend the law in this case. For the reasons explained below, the defendant is not a "law-abiding, responsible" citizen protected by the Second Amendment. *See District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). As such, he cannot satisfy *Bruen's* initial step of considering whether the restricted conduct is covered by the Second Amendment's text. And even if he could, he cannot satisfy *Bruen*'s second step, as historical tradition supports restrictions such as those challenged here. Accordingly, this Court should deny the defendant's motion.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 6, 2023, the defendant was indicted by a Hampton, Virginia, Grand Jury, for felony offenses including unlawful and felonious sexual intercourse against the victim's will by force, threat, and or intimidation and causing the victim to unwillingly engage in sodomy, by force, threat, or intimidation. *See* Exhibit 1.

In or about July of 2024, while he was still under indictment for felony charges in Hampton, Virginia, the defendant received a Glock 27 .40 caliber semiautomatic handgun, serial number BYAG641.  ECF No. 45.  The defendant received the Glock handgun from M.M., a woman with whom he was then having an intimate relationship.  The defendant did not return the firearm despite a request from M.M.  Instead, on or about July 22, 2024, while still under indictment for the felony charges in Hampton, Virginia the defendant and co-conspirators used a United States Postal Service (USPS) arrow key to access a USPS collection box and steal mail.  *Id*.  The defendant drove two co-conspirators to the postal collection box that was under active surveillance by undercover officers.   When police announced themselves to the defendant and his co-conspirators, they fled.  The defendant was apprehended after a high-speed chase from police.  He was in possession of the above-described firearm that he received from M.M. while under indictment, which was ostensibly being used as protection in furtherance of the conspiracy to steal mail and related offenses.

On December 9, 2024, a Grand Jury returned a superseding indictment, charging the defendant with Conspiracy to Commit Offenses Against the United States in violation of 18 U.S.C.

§ 317, Theft of Mail in violation of 18 U.S.C. § 1708, and Illegal Receipt of a Firearm by a Person Under Indictment in violation of 18 U.S.C. § 922(n).  *Id.*

On January 14, 2025, the defendant, through counsel, filed a motion to dismiss Count 3 of the Superseding Indictment charging him with Illegal Receipt of a Firearm by a Person Under Indictment in violation of 18 U.S.C. § 922(n).  ECF No. 53.

## ARGUMENT

Relying on *Bruen*, the defendant asserts that § 922(n), which prohibits the receipt of a firearm by a person under indictment, violates his Second Amendment right to bear arms.

The Second Amendment provides that a "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. AMEND. II.  But as the Supreme Court has repeatedly emphasized, "the right secured by the Second Amendment is not unlimited."  *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *see Bruen*, 142 S. Ct. at 2128 (2022); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion).

In *Bruen*, the Court set a two-step standard for applying the Second Amendment.  First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Bruen*, 142 S. Ct. at 2129–30.  Second, when a regulation burdens such presumptively protected conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2130.  § 922(n) satisfies both prongs of this standard.

First, the conduct regulated by the provision falls outside the right incorporated by the Second Amendment's text as interpreted by the Supreme Court.  Individuals under felony

indictment, and thus precluded from receiving firearms by § 922(n), are not law-abiding, responsible citizens protected by the Second Amendment.

Second, even if the challenged statute could be understood as regulating conduct presumptively within the Amendment's text, it is nonetheless permissible, as it is consistent with the nation's tradition of firearm regulation.  Section  922(n)'s prohibition on receipt of firearms by those under felony indictment is supported by historical laws categorically disarming groups of people perceived as not law-abiding or responsible, including surety laws temporarily disarming those suspected to pose a danger, and by the tradition of broad pretrial detention and other restrictions for those charged with felonies.

Like *Bruen*, *Rahimi* instructs courts considering Second Amendment challenges to examine the Nation's historical tradition of firearms regulation.  The Supreme Court cautioned that although a firearms law "must comport with the principles underlying the Second Amendment," "it need not be a 'dead ringer' or 'historical twin.'"  *Rahimi*, 2024 WL 3074728, at *6 (citation omitted).  And the Court explained that "[w]hy and how" the historical and modern regulations burden the right to bear arms are central to the historical inquiry. *Id.*

Notably, in the wake of *Bruen and Rahimi*, the Courts of Appeal have upheld the constitutionality of prosecutions under § 922(n).  *See United States v. Quiroz*, ___ F.4th ___, 2025 WL 79718 (5th Cir. Jan. 13, 2025).

I.      **Supreme Court Precedent Recognizes that the Second Amendment Applies to Law-Abiding, Responsible Citizens**

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed."  But that right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.  § 922(n) does not prohibit conduct within the scope of that right.

The Supreme Court has repeatedly treated the Second Amendment as extending only to law-abiding, responsible citizens. *Heller* described the Second Amendment as "elevat[ing] above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Heller*, 554 U.S. at 635. Thus, it was only on the specific assumption that "Heller is not disqualified from the exercise of Second Amendment rights" that the District of Columbia was told it "must permit him to register his handgun and must issue him a license to carry it in the home." *Heller*, 554 U.S. at 635. In contrast, restrictions of individuals outside the category of law-abiding, responsible citizens— such as the "longstanding prohibitions on the possession of firearms by felons"—were described by *Heller* as "presumptively lawful regulatory measure[s]." *Id.* at 626, n.26. The *Heller* Court thus "understood that Congress's power to enact categorical disqualifications was 'part of the original meaning' of the Second Amendment." *Tyler v. Hillsdale County Sheriff's Dept.*, 837 F.3d 678, 691 (6th Cir. 2016) (en banc) (lead opinion) (quoting *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010)).

Following *Heller*, courts recognized that the Second Amendment protects only law-abiding, responsible citizens. In *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010), the Court held that, under *Heller*, "the Second Amendment right is not unlimited, and, in fact, it is specifically *limited* in the case of felon prohibitions." Similarly, in *Medina v. Whitaker*, 913 F.3d 152, 158-59 (D.C. Cir. 2019), the D.C. Circuit held that felons "are not among the law-abiding, responsible citizens entitled to the protections of the Second Amendment." *Id.* at 158-59; see also *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (holding that felons are "categorically different from the individuals who have a fundamental right to bear arms"); *United States v. Bena*, 664 F.3d 1180, 1183-84 (8th Cir. 2011) (concluding that § 922(g)(8) prohibition of firearm possession by people subject to a domestic-violence restraining order does not violate

the Second Amendment, reasoning that the Second Amendment incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible").

*Bruen* similarly described the petitioners there as "ordinary, law abiding, adult citizens" before placing them in the category of those whose conduct "the Second Amendment protects." 597 U.S. at 31-32; *see also id.* at 9 (recognizing "the right of an *ordinary, law-abiding citizen* to possess a handgun in the home for self-defense" and agreeing that "*ordinary, law-abiding citizens* have a similar right to carry handguns publicly for their self-defense"); *id.* at 79 (Kavanaugh, J., concurring) (faulting New York's regime for "deny[ing] the right to carry handguns for self-defense to many '*ordinary, law-abiding citizens*'") (emphases added)). Indeed, the Court's opinion used the term "law-abiding, responsible citizens" and its variations more than a dozen times to describe the Amendment's scope. *See id.* at 15 ("law-abiding, adult citizens"); *id.* at 26 ("law-abiding, responsible citizens"); *id.* at 29 ("law-abiding citizens"); *id.* at 31 ("ordinary, law-abiding, adult citizens"); *id.*at 33 n.8 ("law-abiding citizens"); *id.* at 38 ("law-abiding citizens"); *id.* at 38 n.9 ("law-abiding, responsible citizens"); *id.* at 57 ("the responsible"); *id.* at 60 ("law-abiding citizens"); *id.* at 70 ("law-abiding, responsible citizens").

*Heller* and *Bruen*'s understanding that the Second Amendment's protection is limited to law-abiding, responsible citizens is confirmed by the Amendment's historical context.  Many precursors to the Second Amendment described the class of persons entitled to keep and bear arms using synonyms for "law-abiding, responsible citizens."   In 1780, for example, the town of Williamsburg proposed amending the newly drafted Massachusetts constitution to provide that "the people have a right to keep and bear Arms for their Own and the Common defence."  *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966).  The town explained: "we esteem it an essential

priviledge to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Lawfull Subjects of Government* we Ought Never to be deprived of them." Id. (emphasis added).

Anti-Federalists expressed a similar understanding of the right at Pennsylvania's ratifying convention. They proposed a bill of rights that, among other things, forbade "disarming the people, or any of them, unless for crimes committed, or real danger of public injury from individuals." 2 *The Documentary History of the Ratification of the Constitution (Documentary History)* 598 (Merrill Jensen ed., 1976); see Heller, 554 U.S. at 604. At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added).

Although those precursors used different language from the Second Amendment, they shed light on the Amendment's meaning. *See Heller*, 554 U.S. at 604. The Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope. *Id*. at 603-605. The precursors discussed above reveal a common conception that the government may disarm those who are not law-abiding, responsible citizens.

That includes individuals who are under felony indictment. "An indictment 'fair upon its face,' and returned by a 'properly constituted grand jury,' . . . 'conclusively determines the existence of probable cause' to believe the defendant perpetrated the offense alleged." *Kaley v. United States*, 571 U.S. 320, 328 (2014) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 117, n.19 (1975); *Ex parte United States*, 287 U.S. 241, 250 (1932)). The determination of probable cause allows many restrictions of the liberty of indicted individuals that would otherwise violate their

constitutional rights. They can be searched incident to arrest. *See United States v. Robinson*, 414 U.S. 218, 224-26 (1973). They can be denied bail and detained, pending trial, with their assets frozen. *See Kaley*, 571 U.S. at 330-31; *see also United States v. Salerno*, 481 U.S. 739 (1987). Their First Amendment rights can be curtailed by prohibiting them from receiving books and magazines from private parties. *See Bell v. Wolfish*, 441 U.S. 520, 533, 549-52 (1979).

Recognizing that individuals under indictment for a felony can be temporarily disarmed is thus consistent with other limitations on the rights of indicted individuals. *See Bruen*, 142 S. Ct. at 2130 ("Th[e] Second Amendment standard accords with how we protect other constitutional rights.") Further, *Bruen* itself clarified that the decision should not "be interpreted to suggest the unconstitutionality of the 43 States' 'shall issue' licensing regimes," which "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right." 597 U.S. at 38 n.9 (citing *Heller*, 554 U.S. at 635). That was so although many such standards disqualify indicted defendants. See, e.g., Ariz. Rev. Stat. § 13-3112(E)(3); Ky. Rev. Stat. § 237.110(4)(a); La. Stat. § 40:1379.3(C)(10); Tenn. Code § 39-17-1351(c)(7).

## II.     Section 922(n) Is Consistent with the Historical Tradition of Firearm Regulation

Even if the Second Amendment's text were understood presumptively to encompass the conduct prohibited by the challenged provision, Shield's facial and as applied challenges would fail because § 922(n) is "consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 597 U.S. at 17. When comparing modern and historical gun laws, courts must often "reason[] by analogy," which requires considering whether the challenged regulations are "relevantly similar" to historical laws. *Id*. at 28-29. In assessing proposed historical analogues, courts should focus on "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. A modern law can satisfy *Bruen*'s historical standard even if it is

not "a dead ringer for historical precursors." *Id*. at 30.  The government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id*.

In § 922(n), Congress made it unlawful for a person to receive a firearm while under indictment for a felony.  While felony charges are pending, § 922(n) stops indicted defendants from acquiring new firearms, but does not prevent them from retaining old ones.  That restriction protects the integrity of the criminal-justice system by reducing the risk that indicted criminal defendants will acquire firearms to facilitate their flight.  It also protects the community by reducing the risk that indicted criminal defendants will acquire and use firearms to commit other crimes while awaiting trial.

Section 922(n) is consistent with the nation's tradition of firearm regulation. To protect the community, legislatures have long passed laws disarming groups of people perceived not to be not law-abiding and responsible, including surety laws that temporarily restricted the gun rights of people believed to pose a threat.  In addition, our society has traditionally recognized that the government is entitled to "secure the due attendance of the party accused" at a criminal trial.  *Ex parte Milburn*, 9 Pet. 704, 710 (1835) (Story, J.).  Since the founding, governments have subjected criminal defendants to a variety of restrictions—including restrictions that limit their ability to keep and bear arms—in order to ensure that defendants show up for their trials and refrain from committing other crimes in the meantime.  Each of those practices provides a historical analogue to Section 922(n); all of them, taken together, make it plain that Section 922(n) is fully consistent with this Nation's history and tradition.

### A.    Historical laws disarmed people who were not law-abiding and responsible.

"[T]his Nation's historical tradition of firearm regulation" illuminates the Second Amendment's scope.  *Bruen*, 597 U.S. at 17.  As *Heller* explained, "the Second Amendment was

not intended to lay down a 'novel princip[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)).

The 1689 English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, recited that King James II had disarmed "several good subjects being Protestants." 1 W. & M., Sess. II, c.2 (Eng.). To prevent repetition of that abuse, the Bill guaranteed that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id*. The provision thus recognized that Parliament could determine which citizens could "have arms . . . by Law." See *United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023). While the Bill of Rights condemned the disarming of "good subjects," it allowed the disarming of irresponsible ones.

As such, it did not displace the Militia Act of 1662, which authorized local officials to disarm those "dangerous to the peace of the Kingdome." 14 Car. 2, c.3 § 13 (Eng.). That practice continued after the adoption of the English Bill of Rights.[1] Indeed, many 18th-century justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[2]

---

[1] *See, e.g., Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700– 8 March, 1702,* at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937); Privy Council to the Earl of Carlisle (July 30, 1714), in Historical Manuscripts Commission, *Tenth Report*, *Appendix*, Part IV 343 (1885); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), in Historical Manuscripts Commission, *Fifteenth Report*, *Appendix*, Part VI 39-40 (1897); Order of Council to Lord Lieutenants (Sept. 5, 1745), in Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian*, Preserved at Blickling Hall, Norfolk 148 (1905).

[2] Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); see, e.g., Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, Lex Constitutionis 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace*, *and Parish and Ward-Officer* 231 (6th ed. 1756).

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); see *Bruen*, 597 U.S. at 39-45.  Leading 18th-century scholars agreed that the Statute forbade carrying weapons in a terrifying manner, and that it made violations punishable by forfeiture of the weapons.[3]  The Statute thus allowed the government to disarm persons whose conduct revealed their unfitness to carry arms.

The English understanding that the government could lawfully disarm subjects perceived as irresponsible remained intact at the time of the American Revolution.  In 1780, London officials reacted to widespread rioting by confiscating the rioters' arms.  See Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-131 (1994).  The House of Lords debated—and rejected—a motion declaring that the confiscation violated the English Bill of Rights.  *See id.* at 131-32.  Members defended the confiscation on the ground that it applied only to the "disorderly" "mob," not to "sober citizens" or "citizens of character."[4] In short, although the English Bill of Rights secured a right to possess arms, the government could (and did) disarm those who could not be trusted to use arms lawfully and responsibly.

America inherited this tradition allowing governments to disarm classes of people who were viewed as not dependable adherents to the rule of law.  Early American legislatures denied arms to classes of individuals considered unfit to possess them.  When the Revolutionary War began, the Continental Congress recommended, and many States enacted, laws disarming loyalists

---

[3] See, e.g., 4 William Blackstone, *Commentaries on the Laws of England* 149 (1769); 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

[4] *See*, e.g., 21 The Parliamentary History of England, from The Earliest Period to the Year 1803, at 691 (T.C. Hansard 1814) (speech of Lord Amherst) (June 19, 1780) (defending disarmament of the "mob"); *id.* at 730-731 (June 21, 1780) (speech of Lord Stormont) (distinguishing "disorderly" persons from "sober citizen[s]").

and others who refused to swear allegiance to the new Republic.[5]  *See Jackson*, 69 F.4th at 503.

Similarly, after putting down Shays' Rebellion in 1787, Massachusetts required the rebels, as a

condition of being pardoned, to surrender their arms, which would be returned to them after three

years if they kept the peace. [6]

Colonies and early States punished irresponsible use of arms with forfeiture of the arms.

Early American justice-of-the-peace manuals explained that the Statute of Northampton—which

the colonies inherited along with other pre-colonization statutes, *see Patterson v. Winn*, 5 Pet. 233,

241 (1831)—empowered justices of the peace to confiscate the arms of persons who carried them

in a manner that spread fear or terror.[7]  Some 17th- and 18th-century American statutes expressly

recodified that rule.[8]  Others made forfeiture part of the penalty for offenses such as unsafe storage

---

[5] *See* 4 *Journals of the Continental Congress* 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Dec. 1775, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821).

[6] *See* Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special Statutes of the Commonwealth of Massachusetts* 145-147 (1805).

[7] *See*, e.g., James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22- 24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[8] *See* Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

of guns or gunpowder.[9]  These 17th- and 18th-century practices confirm that legislatures could restrict an individual's ability to bear arms if his conduct suggested that he would not use them responsibly.

Post-ratification commentators and legislation confirm this.  One legal scholar observed that the Second Amendment allowed restricting a person's right to carry firearms where there was "just reason to fear that he purposes to make an unlawful use of them."  William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829).  Another interpreted the Second Amendment to mean that a "free citizen, if he demeans himself peaceably, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840).  A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms."  *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1.

Continuing in the 19th century, as guns became more lethal and more widely available, legislatures disarmed a range of individuals whom they deemed unfit to carry firearms. Numerous jurisdictions banned or restricted the sale of firearms to, or the possession of firearms by, individuals below specified ages,[10] persons of unsound mind,[11] or vagrants.[12]

---

[9] *See* Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland*, 1638-1674, at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New-York*, 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-210 (1906).

[10] *See, e.g.,* Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92.

[11] *See, e.g.,* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159.

[12] *See, e.g.,* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 393; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879).

This long tradition of disarming individuals viewed as not law-abiding and responsible supports § 922(n)'s restriction on indicted defendants. Section 922(n) is "relevantly similar" to these historical precursors as to both "how" and "why" it operates, *see Bruen*, 597 U.S. at 29, in that it uses objective criteria to categorically restrict a specific group's gun rights to promote public safety. As the Supreme Court has recognized, in enacting the predecessor to § 922(n), Congress "sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). Section 922(n) thus squares with "the common law tradition of gun regulation permitt[ing] the disarming of certain classes of individuals based on questions regarding whether those individuals had been peaceable and/ or law-abiding." *United States v. Kelly*, No. 3:22-cr-37, 2022 WL 17336578, *5 (M.D. Tenn. Nov. 16, 2022); *see also United States v. Rowson*, 652 F. Supp. 3d 436, 464 (S.D.N.Y. 2023) (concluding that, like historical laws, "Section 922(n) imposes a partial limit on the firearms rights of a group of persons defined by an objective characteristic that is a fair proxy for dangerousness"); *United States v. Jackson*, 661 F. Supp. 3d 392, 413 (D. Md. 2023) (upholding § 922(n) and noting that "[r]egulations limiting or prohibiting access to firearms by specific groups in the interest of public safety have been part of the Nation's historical tradition since the earliest days of our Nation's founding") (quoting *United States v. Perez-Garcia*, 628 F. Supp. 3d 1046, 1054 (S.D. Cal. 2022)); *United States v. Bartucci*, 658 F. Supp. 3d 794, 804 (E.D. Cal. 2023) (noting that historical laws excluding particular groups, like § 922(n), "cover only a subset of persons that were (are) perceived as more likely to commit crimes and not the public at large").

**B.** **Historical surety laws are analogues to § 922(n).**

An additional group of historical laws that are analogous to § 922(n) are surety laws, which promoted public safety by temporarily restricting gun rights of people believed to pose a threat. *See Bruen*, 597 U.S. at 55-56.

Blackstone explained that under the English common-law surety practice, whenever "any private man ha[d] just cause to fear, that another w[ould] burn his house, or do him a corporal injury, by killing, imprisoning, or beating him," the threatened person could "demand surety of the peace against such person."  4 William Blackstone, Commentaries on the *Laws of England* 252 (1769).  If the threatening person failed to find sureties, he could be immediately committed to jail. *Id.*

The surety practice was adopted in the American colonies.  *See* Rawle, *supra*, at 126.  Two of the colonies that codified the Statute of Northampton passed laws requiring those who went "armed offensively" to obtain sureties.[13]  And by 1791, at least five additional jurisdictions had codified or presumed the availability of the common-law surety system.[14]

In 1836, Massachusetts passed the state surety law discussed in *Bruen*.  See 597 U.S. at 56. That law provided that "[i]f any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided." Mass. Rev. Stat., ch. 134, § 16 (1836).  "Between 1838 and 1871, nine other jurisdictions adopted

---

[13] 1 Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904).

[14] See 2 *Statutes at Large of Pennsylvania from 1682 to 1801*, pg. 23 (1896) (1700 law); 1 *Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven* 52 (1797) (1700 law); *Acts and Laws of His Majesties Colony of Connecticut in New-England* 91 (1901) (1702 law); 1 *General Public Statutory Law and Public Local Law of the State of Maryland, from the Year 1692 to 1839 Inclusive: With Annotations Thereto, and a Copious Index*, pg. xxx (1840) (1776 Declaration of Rights); 13 *Statutes at Large; Being a Collection of All the Laws of Virginia, from the first Session of the Legislature, in the Year 1619*, pg. 41 (1823) (1789 law).

variants of the Massachusetts law." *Bruen*, 597 U.S. at 56 & n.23 (collecting citations); *see also Rowson*, 652 F. Supp. 3d at 468-69 (discussing surety laws).

Surety laws establish a historical tradition that supports § 922(n). (See R. 32, opinion, 100-102.)  First, § 922(n) imposes a comparable burden to historical surety laws, by temporarily burdening only a particular group based on safety concerns. (*See id*. at 102.)  Indeed, in one aspect, § 922(n) is less severe, in that it does not disturb continued possession of firearms, but only receipt of new ones.  The safety justification for § 922(n) is also comparable to that of surety laws: "the period in which an indictment pends is 'a volatile period during which the stakes and stresses of pending criminal charges often motivate defendants to do violence to themselves or others,' thereby reasonably giving rise to fear of threats or violence among the community." *Rowson*, 652 F. Supp. 3d at 470 (quoting *United States v. Kays*, 624 F. Supp. 3d 1262, 1267-68 (W.D. Okla. 2022)); see also *United States v. Laurent*, 861 F. Supp. 2d 71, 102 (E.D.N.Y. 2011) (noting particular dangers associated with receipt of new guns after indictment).

For these reasons, numerous district courts have held that historical surety statutes are analogous to § 922(n). *See, e.g*., Kays, 624 F. Supp. 3d at 1267-68; *United States v. Adger*, No. CR-122-102, 2023 WL 3229933, *4 & n.3 (S.D. Ga. May 3, 2023), *adopted*, 2023 WL 3627840 (S.D. Ga. May 24, 2023); *United States v. Baker*, No. Cr-23-130, 2024 WL 24088 (W.D. Okla. Jan. 2, 2024); *Rowson*, 652 F. Supp. 3d at 465-72; *United States v. Simien*, 655 F. Supp. 3d 540, 551-52 (W.D. Tex. 2023); *Bartucci*, 658 F. Supp. 3d at 803-07; *United States v. Jackson*, 661 F. Supp. 3d 392, 414 (D. Md. 2023); *United States v. Now*, No. 22-cr150, 2023 WL 2717517, *7-8 (March 15, 2023), adopted 2023 WL 2710340 (E.D. Wis. March 30, 2023); *United States v. Trevino*, No. 2:23- cr66, 2023 WL 8237053, *7 (D.N.M. Nov. 28, 2023); *see also Fencl*, 2022 WL 17486363, *3 (analogizing pretrial release condition prohibiting gun possession by an indicted

defendant to surety laws, as both serve public safety by "temporarily burdening the Second Amendment rights of individuals reasonably likely to breach the peace").

### C.   Section 922(n) is strongly supported by a historical tradition of pretrial detention and other restrictions on accused defendants.

In addition to the broader traditions of restricting firearm possession by individuals perceived as not law-abiding and responsible, § 922(n) is strongly supported by historical traditions restricting defendants accused of crimes. Our society has traditionally recognized that the government is entitled to preserve "the safety of the people" from offenders who are awaiting trial. Anthony Highmore, *A Digest of the Doctrine of Bail in Civil and Criminal Cases* vii (1783). Indeed, the Supreme Court has held that "[t]he government's interest in preventing crime by arrestees is both legitimate and compelling." *United States v. Salerno*, 481 U.S. 739, 749 (1987).

Even before an individual was formally charged, the common law allowed an arresting officer to seize, among other things, a suspect's "weapons," lest the suspect use them to "effect an escape from custody." *Agnello v. United States*, 269 U.S. 20, 30 (1925). That power was "always recognized under English and American law" and was "uniformly maintained in many cases." *Weeks v. United States*, 232 U.S. 383, 392 (1914). In keeping with the common law, the Supreme Court's Fourth Amendment cases establish that, "[w]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." *Chimel v. California*, 395 U.S. 752, 762-763 (1969). One 19th-century court cited that doctrine to illustrate the point that the right to keep and bear arms is not absolute. *See State v. Buzzard*, 4 Ark. 18, 21 (1842) (asking rhetorically, "[i]f the right to keep and bear arms be subject to no legal control or regulation whatever, ... [b]y what legal right can a person accused of a crime be disarmed?").

Following formal charges, further restrictions on the accused have long been imposed.  In the United States at the time of the founding, persons indicted for serious crimes were usually subject to detention without bail.  That effect resulted from the combination of two separate practices: (1) the imposition of the death penalty for serious crimes and (2) the denial of bail to defendants indicted on capital charges.

"[D]eath was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation omitted); see *Tennessee v. Garner*, 471 U.S. 1, 13 (1985) (explaining that, at common law, "virtually all felonies were punishable by death").  The First Congress imposed capital punishment for crimes such as "forgery of United States securities" and "running away with a ship or vessel, or any goods or merchandise to the value of fifty dollars." *Harmelin v. Michigan*, 501 U.S. 957, 980-81 (1991) (opinion of Scalia, J.) (brackets and citation omitted).  And the States imposed capital punishment even for "nonviolent crimes such as forgery and horse theft." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019).

A founding-era capital defendant's entitlement to bail historically turned on the strength of the prosecution's evidence against him.  The First Congress granted criminal defendants an absolute right to bail in non-capital cases, but made bail discretionary "where the punishment may be death."  Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 91.  Congress directed courts to "exercise their discretion" in light of the "evidence" against the defendant. *Id*.  Similarly, state constitutional provisions guaranteeing a right to bail were "with little variation expressed in the following language: 'All prisoners shall be bailable by sufficient sureties, unless for capital offenses, where the proof is evident or presumption great.'" Donald B. Verrilli, Note, *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 351 (1982).

In determining whether the evidence was sufficiently strong to justify denying bail, courts accorded great weight to the grand jury's indictment.  Chief Justice Marshall's decisions during Aaron Burr's trial for treason (a capital crime) illustrate that practice.  Chief Justice Marshall "admitted [Burr] to bail" "before indictment," but "refused bail" "after indictment."  Thomas F. Davidson, *The Power of Court to Let to Bail*, 24 Am. L. Reg. 1, 3 (1876).  At the bail hearing, Chief Justice Marshall "doubted extremely" whether he had the power to grant bail "after an indictment."  1 David Robertson, *Reports of the Trials of Colonel Aaron Burr* 311 (1808).  He rejected Burr's invitation to "go into testimony extrinsic to the indictment," stating that he "had never known a case . . . where such an examination had taken place."  *Id*. at 312 (emphasis omitted); cf. *Kaley v. United States*, 571 U.S. 320, 328 (2014) ("We have found no 'authority for looking into and revising the judgment of the grand jury upon the evidence.'") (citation omitted).

Some authorities leave open the possibility of granting bail in an exceptional case—say, where "the trial of the prisoner has been unreasonably delayed," *Tinder*, 19 Cal. at 540, or where "his continued confinement would endanger his life," *Merrick*, 10 La. Ann. at 428.  But they show that in early America, a defendant indicted for a serious (and hence capital) crime would *ordinarily* be held without bail.  *See also* Sandra G. Mayson, *Dangerous Defendants,* 127 Yale L.J. 490, 502 (2018) ("Capital defendants have been excluded from bail since colonial days").

Pretrial detention without bail necessarily operates as a restriction on the right to keep and bear arms.  See, e.g., Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983) ("We may presume that persons confined in galos awaiting trial on criminal charges were . . . debarred from the possession of arms").  The long historical tradition of pretrial detention of defendants charged with serious crimes thus

supports the significantly lesser restriction of prohibiting their receipt of firearms while under indictment.

Moreover, historically, even a defendant who was released on bail remained subject to significant restrictions while awaiting trial.  A defendant seeking release on bail had to find sureties who were willing to guarantee his attendance at trial and his good behavior in the meantime.  *See* 3 William Blackstone, *Commentaries on the Laws of England* 290 (1765).  Sureties in this context were responsible for "monitoring" and "keeping track" of the defendant after release.  John F. Duffy & Richard M. Hynes, *Asymmetric Subsidies and the Bail Crisis*, 88 U. Chi. L. Rev. 1285, 1313 (2021).  Courts "look[ed] to their vigilance to secure the attendance and prevent the absconding of the [defendant]." *United States v. Simmons*, 47 F. 575, 577 (C.C.S.D.N.Y. 1891). Sureties were also often required to ensure that the defendant "ke[pt] the peace" until trial. 4 Blackstone, *supra*, at 250.  If the sureties failed to fulfill their duties, they would forfeit a sum of money, over and above the sum forfeited by the defendant. *See* 3 id. at 280, 4 *id*. at 250.

To enable sureties to fulfill their functions, the common law granted them legal custody of the bailed defendant.  Lord Chief Justice Coke explained that the "word Baile" is "derived from the French word Bailer, which signifieth to deliver, because he that is Bailed, is as it were delivered into the hands and custody of those that are his Pledges and Sureties."  Edward Coke, *A Little Treaties of Baile and Maineprize* 1 (2d ed. 1637).  Lord Chief Justice Hale agreed that "he that is bailed, is in supposition of law still in custody, and the parties that take him to bail are in law his keepers." 2 Matthew Hale, *The History of the Pleas of the Crown* 124 (1736).  Blackstone defined bail as "a delivery, or bailment, of a person to his sureties . . . he being supposed to continue in their friendly custody, instead of going to gaol." 3 Blackstone, *supra*, at 290.  And the Supreme Court observed in the 19th century that a bailed defendant "is regarded as delivered to the custody

of his sureties," whose "dominion is a continuance of the original imprisonment." *Taylor v. Taintor*, 83 U.S. 366, 371 (1873).

As the defendant's legal custodians, the sureties enjoyed "unrestricted authority over [his] person." Charles Petersdorff, *A Practical Treatise on the Law of Bail in Civil and Criminal Proceedings* 514 (1824). "Whenever they ch[ose] to do so," they could terminate the defendant's release, "seize him," and "deliver him up" to the court. *Taylor*, 83 U.S. at 371. To that end, they could "pursue him," "break and enter his house," "arrest him," and even "imprison him" until he could be surrendered. *Id.* at 371. They could also restrict his movement, say by forbidding him to "go beyond the limits of the State within which he is to answer." *Id.* at 372. A defendant's sureties were thus "gaolers of his own choosing." 2 William Hawkins, *A Treatise of the Pleas of the Crown* ch. 15, § 84, at 178 (6th ed. 1787). They had the defendant "on a string," and they could "pull the string whenever they please [d]." *Taylor*, 83 U.S. at 372 (citation omitted).

The historical traditions discussed above restricting defendants accused of crimes strongly support the constitutionality of § 922(n). First, § 922(n) and the historical precursors are all "comparably justified." *Bruen*, 597 U.S. at 29. Pretrial detention, the powers of the sureties, and the seizure of arrestees' weapons all serve the government's interests in interests in "bringing the accused to trial" and in "preventing crime by arrestees." *Salerno*, 481 U.S. at 745, 750. Section 922(n) serves similar purposes. It reduces the risk that criminal defendants will use firearms to facilitate their flight, and it helps ensure that indicted criminal defendants do not use firearms to commit other crimes while awaiting trial.

The "burden[s]" imposed by § 922(n) are also "comparable" in important ways to the burdens imposed by historical restrictions on accused defendants. *Bruen*, 597 U.S. at 29. Like those precursors, § 922(n) applies only to those who have been accused based on probable cause,

not to the public at large.  And like those precursors, § 922(n) imposes only a temporary restriction on the defendant's rights.  It remains in force during the criminal proceeding but ceases to operate once the case ends.

In other respects, § 922(n) is significantly less burdensome than the restraints on criminal defendants' liberty accepted at the founding.  Detention without bail involves the total denial of liberty, including the total denial of any ability to keep and bear arms.  Release on bail traditionally involved subjection to the legal custody and "unrestricted authority" of the sureties.  Petersdorff, *supra*, at 514.  And a criminal defendant who is arrested may be deprived of weapons that he already possesses.  Section 922(n), in contrast, does not subject persons under felony indictment to a total denial of liberty, to the legal custody and unrestricted authority of third parties, or to the deprivation of arms that already belong to them.  It just temporarily precludes them from receiving new firearms.

Section 922(n) is also narrower in scope than its historical counterparts.  The rules governing sureties and arrest extended to all criminal cases—misdemeanors as well as felonies.  Section 922(n), in contrast, extends only to "crime[s] punishable by imprisonment for a term exceeding one year." § 922(n).  Such crimes are comparable in seriousness to the capital crimes of early America.  *See Medina*, 913 F.3d at 158.  Finally, § 922(n) incorporates more procedural safeguards than its historical forbears. Even before an indictment, an arresting officer can disarm a suspect, a surety can exercise custodial authority, and a magistrate can choose to deny bail.

These historical restrictions on accused defendants show that § 922(n) is "consistent with this Nation's historical tradition," *Bruen*, 597 U.S. at 17. See, e.g., *United States v. Alston*, No. 5:23-cr-21, –F. Supp. 3d–, 2023 WL 7003235, *2-3 (E.D.N.C. Oct. 24, 2023) (order); United States v. Posada, No. 22-cr-1944, – F. Supp. 3d –, 2023 WL 3027877, *5 (W.D. Tex. Apr. 20,

2023); cf. *United States v. Slye*, No. 1:22-mj-144, 2022 WL 9728732, *2-3 (W.D. Pa. Oct. 6, 2022) (addressing pretrial release condition prohibiting gun possession); *Fencl*, 2022 WL 17486363, *2 (same).

## III.   At a Minimum, The Defendant's Facial Challenge Must be Rejected

While the above sections establish that § 922(n) is in fact constitutional in all its applications, at a minimum, the defendant cannot show that the provision is facially unconstitutional. Facial challenges are disfavored and should only be granted as a last resort. A party bringing a facial challenge can succeed only "by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' i.e., that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting Salerno, 481 U.S. at 745); accord, e.g., *United States v. Fields*, 53 F.4th 1027, 1038 (6th Cir. 2022). The demanding requirements for facial invalidation honor the "fundamental principle . . . that courts . . . should [not] formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Washington State Grange*, 552 U.S at 450. Moreover, facial invalidation would be particularly inappropriate given that § 922(n) is subject to a severability clause, which states that the invalidation of one of the statute's applications does not affect "the application of such provision to other persons not similarly situated or to other circumstances." 18 U.S.C. § 928.

## IV.   The Defendant's As-Applied Challenge Must be Rejected

The defendant cannot show that § 922(n) as applied to him is unconstitutional. As discussed above, the plain text of the Second Amendment does not protect his conduct in possessing the firearm at issue in this case. Further, the particular details of the defendant's felony indictment demonstrate that he posed a danger more than warranting that he not receive and possess firearms. While the defendant argues that him being dangerous is undermined by being

released on bond and not being prohibited from possessing firearms while on bond, the nature of the state charges is sufficiently aggravated.  He was charged with two of the most serious felony offenses in the Commonwealth of Virginia:  rape in violation of Virginia Code § 18.2-61 and forcible sodomy in violation of Virginia Code § 18.2-67.1.  In Virginia, both of these offenses are punishable by up to life imprisonment.  These are heinous crimes that carry manifest danger to victims and the community.  It is plainly obvious the defendant and any other defendant who has had a grand jury make a probable cause determination about such conduct should be subject to disarmament.  The Hampton, Virginia grand jury found probable cause to believe that the defendant engaged in the charged acts which necessarily involved force, threat, or violence directed at the victim.  *Cf. Rahimi*, 144 S. Ct. at 1901 ("Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed.").

The defendant's pending criminal charges were not limited to the offense conduct in Hampton.  At the time he received the firearm at issue, he also had pending criminal charges in San Mateo, California, for carrying a stolen firearm for transporting a firearm from Norfolk, Virginia, to San Francisco, California on his domestic flights.  *See* Exhibit 2.  He was found in possession of $3,000 of U.S. currency, two stolen two firearms, and 38 live rounds of 9mm ammunition.  *Id*.  When interviewed by police, the defendant admitted to illegally purchasing the stolen firearms from a man in Hampton.  *Id*.  He told police that he needed the firearms for protection because he waws a "bounty hunter" and "armed security."  *Id*.

While ultimately the state charges against the defendant were *nolle prossed*, this illustrates that the restriction on firearm possession was actually of limited duration in this case.  *See United States v. Rahimi*, 144 S. Ct. 1889, 1902 (2024) (reasoning that, "like surety bonds of limited

duration, Section 922(g)(8)'s restriction was temporary as applied to Rahimi").   Moreover, this has no bearing on his status at the time he committed the firearm offense at issue.  He was very much still under indictment for rape and forcible sodomy, which demonstrated a danger warranting his disarmament.   Courts have rejected similar as-applied challenges even where a felony indictment was later dismissed, reasoning:

> In particular, defendant notes that his Arizona indictment was ultimately "dismissed in its entirety on May 24, 2022, by motion of the prosecution." However, the analysis the Court applied above is not contingent on whether the defendant was convicted.   After all, surety laws were "intended merely for prevention without any crime actually committed by the party, but arising only from a probable suspicion."   4 William Blackstone, Commentaries on the Laws of England 252 (1769).  And, as discussed, restricting access to firearms for persons who are indicted with a felony is consistent with the Nation's historical tradition. Therefore, defendant's as-applied challenge also fails."

*United States v. Jackson*, 661 F. Supp. 3d 392, 414-15 (D. Md. 2023).  The Maryland court's reasoning is equally true on the facts before this Court.  And the felony offenses at issue in the Maryland case (hindering prosecution in the first degree, a weapons offense, and resisting arrest) were far less serious than the rape and forcible sodomy offenses at issue with the instant defendant.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the defendant's Motion to Dismiss (ECF No. 53).

Respectfully submitted,

Erik S. Siebert
United States Attorney

By:      _____/s/_____
         Therese N. O'Brien
         Assistant United States Attorney
         United States Attorney's Office
         Eastern District of Virginia
         One City Center
         11815 Fountain Way, Suite 200
         Newport News, VA 23606
         Phone: (757) 591-4000
         Fax: (757) 591-0866
         Therese.o'brien@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that January 21, 2025, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will then send a notification of such filing ("NEF") to all

counsel of record.


_____/s/_____
Therese O'Brien
Assistant United States Attorney